UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Wilfred Bessette,

       Plaintiff,

       v.                                 Civil Action No. 2:13-cv-250-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.

## OPINION AND ORDER
(Docs. 14, 17)

Plaintiff Wilfred Bessette brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security denying his applications for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI).  Pending before the Court are Bessette's motion to

reverse the Commissioner's decision (Doc. 14), and the Commissioner's motion to affirm

the same (Doc. 17).  For the reasons stated below, Bessette's motion (Doc. 14) is

DENIED, and the Commissioner's motion (Doc. 17) is GRANTED.

## Background

Bessette was 40 years old on his alleged disability onset date of August 24, 2007.[1]

He completed school through the 11th grade.  His job history consists of working as a

newspaper inserter and a cleaner/janitor.  He has not worked since 2007.

---

[1] Bessette's prior DIB and SSI applications were denied on July 1, 2010.  (AR 25.)  Thus, the period under review in the instant applications is from July 2, 2010, the day after the initial decision denying benefits, through July 23, 2012, the date of the decision under review herein.  (*Id.*; AR 35.)

As a child, Bessette was emotionally and physically abused by his father, and observed his father physically abuse his mother. (AR 566–67.) He has been married twice and has six adult children. (*Id.*; AR 52.) A 2012 psychological report states that Bessette was living with two of his children at that time and could not live with his second wife due to his inability to control his anger. (AR 567; *see also* AR 50–52.) He reported having a history of domestic abuse and being charged with domestic assault on two occasions, the more recent charge arising from punching his daughter in the arm after he stopped taking his prescribed medication. (AR 52, 564–66.) He stated that, in general, when he stopped taking his medication, he abused his wife and children emotionally/verbally. (AR 564.) He further stated that he was dismissed from his job as a newspaper inserter because he "yell[ed] and shout[ed] at people." (*Id.*) Given his abusive treatment of his wives and children, Bessette stated: "I'm happy as long as I get to talk to my kids and see them once in a while." (AR 565.)

Bessette suffers from depression, anxiety, posttraumatic stress disorder (PTSD), and difficulty concentrating, remembering, and maintaining attention. (AR 568, 570.) He has thoughts of suicide and states that he has attempted suicide many times. (AR 558–59, 568–69.) He testified that he is unable to work due to his anxiety and anger issues, and "not wanting to be around people" (AR 46), as well as because of his attention deficit hyperactivity disorder (ADHD) and depression (AR 47). He stated that he is always thinking about harming himself and more recently has been acting on those thoughts by overdosing on medications and drinking harmful chemicals. (AR 49.) In addition to his mental problems, Bessette has back pain and glaucoma/impaired vision.

2

(AR 357, 359.)  On a typical day, Bessette sits around the house pacing and worrying about things.  (AR 47.)  Occasionally he goes for walks and spends time playing games online.  (*Id.*)  He generally has no interest in going anywhere, seeing anyone, or doing anything.  (*Id.*)

On January 13, 2011, Bessette protectively filed applications for DIB and SSI. Therein, he alleged that, starting on August 24, 2007, he has been unable to work due to glaucoma, depression, obsessive compulsive disorder, ADHD, anxiety, and suicidal thoughts.  (AR 196.)  The applications were denied initially and upon reconsideration, and Bessette timely requested an administrative hearing.  The hearing was conducted on May 18, 2012 by Administrative Law Judge (ALJ) Thomas Merrill.  (AR 41–62.) Bessette appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified at the hearing.  On July 23, 2012, the ALJ issued a decision finding that Bessette was not disabled under the Social Security Act during the relevant period. (AR 35.)  Thereafter, the Appeals Council denied Bessette's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 5–10.)  Having exhausted his administrative remedies, Bessette filed the Complaint in this action on September 13, 2013.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

4

Employing this sequential analysis, ALJ Merrill first determined that Bessette had not engaged in substantial gainful activity since his modified alleged disability onset date of July 2, 2010.  (AR 27.)  At step two, the ALJ found that Bessette had the severe impairments of polysubstance dependence and depression NOS (not otherwise specified).  (*Id.*)  Conversely, the ALJ found that Bessette's glaucoma and back problems were non-severe, and that his low IQ was not a medically determinable impairment.  (AR 28–29.)  At step three, the ALJ found that none of Bessette's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 29.)  Next, the ALJ determined that Bessette had the RFC to perform a full range of work at all exertional levels and retained the capacity to understand and follow directions, except that he could sustain attention/concentration for only "simple tasks," could respond and relate adequately to others only in a "low[-]contact setting," and could adapt to only "simple changes."  (AR 31.)  Given this RFC, the ALJ found that Bessette was capable of performing his past relevant work as a newspaper inserter and a cleaner/janitor, and thus was not disabled from July 2, 2010 through the date of the decision.  (AR 35.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

Bessette argues that the ALJ: (1) erred in finding that Bessette's only severe impairments were depression and polysubstance dependence; (2) erred in his evaluation of various medical assessments, including those of physical therapist (PT) Joshua

Rudman, clinician Michael Richards-Bradt, MA, psychologist Brett Hartman, PsyD,

mental health counselor Thomas Mott, MS, LCMHC, LADC, and nonexamining agency

psychological consultant T. Bruni; (3) failed to adequately consider Bessette's Global

Assessment of Functioning (GAF) scores; and (4) made an improper credibility finding.

Bessette claims that, had the ALJ not made these errors, his RFC determination would

have been more restrictive and he would have been found disabled.  As explained below,

the Court finds Bessette's arguments unpersuasive and determines that the ALJ's

decision is legally proper and supported by substantial evidence.

## I.      The ALJ Did Not Err at Step Two.

Bessette claims that the ALJ erred at step two by finding that Bessette's only

severe impairments were depression and polysubstance dependence, and by "ignoring"

Bessette's major depressive disorder (MDD), anxiety disorder, impaired cognitive

functioning, and low back pain.  (Doc. 14-1 at 9.)  Preliminarily, the ALJ did not ignore

these conditions, but rather considered them in detail.  (*See* AR 28–29.)  Moreover,

substantial evidence supports the ALJ's step-two analysis.

It is the claimant's burden to show at step two that he had a medically severe

impairment or combination of impairments during the alleged disability period.  *See*

*Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("If the process ends at step two, the

burden of proof never shifts to the [Commissioner]. . . .  It is not unreasonable to require

the claimant, who is in a better position to provide information about his own medical

condition, to do so.").  The regulations define a "severe" impairment as one "which

significantly limits [the claimant's] physical or mental ability to do basic work activities."

20 C.F.R. § 404.1520(c); *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010).  An

impairment or combination of impairments is "not severe" when medical evidence

establishes "only a slight abnormality or a combination of slight abnormalities which

would have no more than a minimal effect on [the claimant's] ability to work even if the

[claimant's] age, education, or work experience were specifically considered (i.e., the

[claimant's] impairment(s) has no more than a minimal effect on his or her physical or

mental ability(ies) to perform basic work activities)."  SSR 85-28, 1985 WL 56856, at *3

(1985).

      Bessette argues that the ALJ should have found that he had "major depressive

disorder" rather than "simply depression."  (Doc. 14-1 at 9.)  The issue, however, is

whether Bessette's depression was severe, i.e., whether it significantly limited Bessette's

ability to do basic work activities, not what terminology the ALJ or Bessette's medical

providers used to describe it.  The ALJ found that Bessette's depression was severe and

considered its effect on Bessette's ability to work throughout the decision.  Therefore,

there was no step-two error regarding this impairment.  Moreover, as discussed in more

detail below, substantial evidence supports the ALJ's decision to rely on the opinion of

Dr. Javier Vargas regarding Bessette's depression and other mental impairments rather

than on the opinions of the other medical providers who evaluated these impairments.  As

the ALJ explained, Dr. Vargas had a longer and more extensive treatment relationship

than the other providers had with Bessette.  (AR 28, 558–61.)  *See* 20 C.F.R. §

404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more

times you have been seen by a treating source, the more weight we will give to the

source's medical opinion.").  The ALJ specifically stated that Dr. Vargas had a "greater

opportunity to observe and evaluate [Bessette] . . . during the five[-]day inpatient stay at

[the hospital]."  (AR 28.)  In any event, the ALJ considered Bessette's mental

impairments throughout his decision, and thus any error at step two was harmless.  *See*

*Plante v. Astrue*, Civil Action No. 2:11–CV–77, 2011 WL 6180049, at *4 (D. Vt. Dec.

13, 2011) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

Bessette also argues that the ALJ should have determined that his low IQ and back

pain were severe impairments.  But as the ALJ noted, no treating provider assessed

Bessette with a low IQ, and Bessette could not produce school records to support his

claim that he had been in special education classes.  (AR 29, 204–06.)  Furthermore, the

ALJ accounted for Bessette's learning problems by including in his RFC determination a

limitation that Bessette could sustain attention/concentration for only simple tasks and

could adapt to only simple changes.  (AR 31.)  Regarding back pain, the ALJ accurately

noted that Bessette did not include this condition in various disability forms and

mentioned it in his Function Report only to say that his back pain "sometimes" affected

his ability to put on his socks.  (AR 28 (citing AR 195–202, 208, 226–37).)  The ALJ also

accurately noted that x-rays of Bessette's spine showed only minor findings, and a

February 2011 physical examination conducted by consulting physician Dr. Nader

Wassef revealed no musculoskeletal abnormalities other than reported diffuse tenderness

in the lumbar spine area.  (AR 28 (citing AR 368–73).)

Accordingly, the ALJ did not err at step two, and substantial evidence supports the

ALJ's decision regarding the severity of Bessette's impairments.

9

**II.      The ALJ's Analysis of the Medical Assessments and GAF Scores Was Proper.**

Next, Bessette contends that the ALJ did not properly analyze the medical assessments provided by PT Rudman, clinician Richards-Bradt, psychologist Dr. Hartman, counselor Mott, and agency consultant Bruni.  Bessette further contends that the ALJ erred in failing to consider various low GAF scores included in these assessments.  For the following reasons, the Court finds no error on these grounds.

**A.      PT Joshua Rudman**

In July 2010, PT Rudman examined Bessette and prepared a "Statement of Physical Ability to [D]o Work-Related Activities" based on that examination.  (AR 359–64.)  Rudman found that Bessette occasionally lifted 40 pounds from floor to waist; frequently lifted 10 pounds from floor to waist; occasionally lifted 30 pounds from waist to shoulder; frequently lifted 20 pounds from waist to shoulder; occasionally lifted 20 pounds overhead; and occasionally carried 40 pounds for 50 feet.  (AR 364.)  He further found that Bessette could sit for five hours, stand for six hours, and walk for five hours in an eight-hour day.  (AR 361.)  Rudman noted that during the examination, Bessette demonstrated ladder climbing, stooping, crawling, and kneeling, occasionally limited by back and knee pain.  (AR 364.)  Rudman stated that Bessette gave "high levels" of physical effort during the examination, but that his reports of functional tolerances were "underestimated," compared with his actual abilities, indicating "low reliability."  (*Id.*)  As an example, Rudman stated that Bessette told him he could lift only 25 pounds but demonstrated the ability to lift 40 pounds.  (*Id.*)

The ALJ discussed Rudman's evaluation in detail, affording little weight to it for several reasons: (1) Rudman was not an "acceptable medical source" under the regulations; (2) Rudman saw Bessette only one time for approximately one hour; (3) Rudman's report was based on Bessette's own subjective reporting, and Rudman noted that some of Bessette's responses showed variable reliability; and (4) Rudman's finding that Bessette could stand for only six hours in an eight-hour day was not supported by any other medical provider's opinion.  (AR 29.)  These are all good reasons for affording little weight to Rudman's opinion.

First, it was proper for the ALJ to consider that Rudman was not an acceptable medical source.  Medical sources such as physical therapists are defined in the regulations as "other sources," 20 C.F.R. § 404.1513(d), rather than "acceptable medical sources" like licensed physicians and psychologists, *id.* at § 404.1513(a).  Although opinions from these "other sources" may be used "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work," 20 C.F.R. § 404.1513(d)(1), ALJs are not required to evaluate them in the same manner as required under the treating physician rule, 20 C.F.R. § 404.1527(a)(2).  *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *Duran v. Comm'r of Soc. Sec.*, 296 F. App'x 134, 136 (2d Cir. 2008) (finding no error in ALJ decision to disregard assessment of "medical records physician" because it was not from an acceptable medical source and did not include clinical findings).

Second, it was proper for the ALJ to consider that Rudman saw Bessette only one time.  *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who

see a patient only once or twice do not have a chance to develop an ongoing relationship

with the patient and thus are generally not considered treating physicians) (citing

*Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)); *cf.*, 20 C.F.R. §

416.927(c)(2) (an ALJ should generally "give more weight to" the opinion of a doctor

who treated a claimant *on an ongoing basis* and thus could provide a "detailed,

longitudinal picture of [the claimant's] medical impairment(s)," offering a more "unique

perspective to the medical evidence" than provided by reports from "individual

examinations, such as consultative examinations or brief hospitalizations") (emphasis

added).  The ALJ also noted that Rudman saw Bessette for only approximately one hour.

(AR 29.)  Bessette correctly points out that, in fact, Rudman's evaluation of Bessette

lasted one hour and 30 minutes.  (Doc. 14-1 at 12; AR 365.)  But whether Rudman saw

Bessette for 60 minutes or 90, the fact remains that there was only one meeting and it was

of a relatively short duration: there was clearly no treating relationship between Rudman

and Bessette.

Third, the ALJ gave less weight to Rudman's evaluation because it was largely

based on Bessette's own subjective reporting rather than on objective testing or a

treatment relationship between Rudman and Bessette.  Despite Bessette's claim to the

contrary, the evaluation does in fact indicate that it was based on Bessette's own self-

reporting regarding the walking limitations Rudman assigned to Bessette.  The evaluation

states: "[Bessette] reported he could ambulate at least 30 minutes at one time, some time

[sic] more depending on his pain levels.  Therefore he could walk frequently . . . but not

constantly throughout the day."  (AR 364.)  Moreover, the ALJ's statement that Rudman

noted variable reliability regarding some reporting by Bessette was accurate.  (*Id.*)

Although, as Bessette points out, Rudman also found that Bessette was reliable in

reporting about other areas, it was not error for the ALJ to consider that Bessette was

found to be unreliable in certain areas.

      Finally, the ALJ correctly afforded less weight to Rudman's evaluation because

Rudman's finding that Bessette could stand for only six hours in an eight-hour day was

not supported by any other medical provider's opinion.  *See* 20 C.F.R. § 404.1527(c)(4)

("Generally, the more consistent an opinion is with the record as a whole, the more

weight we will give to that opinion.").  Bessette accurately points out that in fact Dr.

Wassef observed "diffuse tenderness in the lumbar spine area" (AR 370) and diagnosed

"[l]ower back pain" (AR 371).  (Doc. 14-1 at 13–14.)  But, as discussed earlier, the ALJ

explained that Dr. Wassef's physical examination and x-rays were otherwise normal, and

Dr. Wassef's report states that Bessette's cervical and lumbar spines showed full flexion,

extension, lateral flexion bilaterally, and rotary movement bilaterally; and Bessette

displayed a normal gait, the ability to heel/toe walk without difficulty, the ability to squat

fully, and the ability to rise from a chair without difficulty.  (AR 369–70.)

     **B.**    **Clinician Michael Richards-Bradt, MA**

      Next, Bessette argues that the ALJ did not give enough consideration to the

assessment of Michael Richards-Bradt, MA, and his supervisor Kerry Stout, LICSW.

(Doc. 14-1 at 14.)  Richards-Bradt examined Bessette on April 12, 2012, and assessed

him with MDD, PTSD, generalized anxiety disorder, and alcohol dependence, and

assigned a GAF score of 42.  (AR 570–71.)

The ALJ properly gave little weight to this assessment for two of the same reasons he gave little weight to PT Rudman's assessment: (1) as a mental health counselor and a licensed social worker, neither Richards-Bradt nor his supervisor Stout were "acceptable medical sources" under the regulations, *see Duran*, 296 F. App'x at 136; and (2) Richards-Bradt saw Bessette only one time for approximately one hour, *see Petrie*, 412 F. App'x at 405.  (AR 28, 34; *see* AR 569, 571.)  In addition, the ALJ correctly stated that Richards-Bradt did not render an opinion in his assessment regarding any functional limitations.  (AR 34; *see* AR 563–79.)  Indeed, most of the assessment is based on Bessette's own statements regarding his background, medical status, and psychiatric condition, and Richards-Bradt explicitly and repeatedly states this fact therein.[2]  (*See, e.g.*, AR 570.)

Furthermore, the ALJ noted several inconsistencies between statements recorded in Richards-Bradt's assessment and the record evidence.  For example, the assessment states that Bessette reported to Richards-Bradt that he had been admitted to Fletcher Allen Health Care Center (FAHC) "4–5 times," the most recent occasion being March 7, 2012, when he was prescribed lorazepam and Seroquel.  (AR 563.)  The ALJ accurately stated, however, that the only March 7, 2012 record from FAHC actually indicates that Bessette was told to *stop* taking Seroquel on that date.  (AR 34 (citing AR 456).)  Moreover, Richards-Bradt's assessment indicates that Bessette told Richards-Bradt that he had ingested 1700 mgs of Seroquel in April 2011 in an attempt to commit

---

[2]  Noteworthy, Richards-Bradt records in the assessment that Bessette himself stated he "[had] experienced no medical problems in the past 30 days[,]" "ha[d] not been bothered at all by medical problems during this time period," and "expressed no need for medical treatment."  (AR 563.)

suicide.  (AR 563.)  The ALJ noted that, had Bessette taken such a high dose of Seroquel,

hospitalization would have been inevitable, but "[t]here is no note of an April 2011

ho[sp]italization."  (AR 34.)  It was proper for the ALJ to consider the supportability and

credibility of statements made by Bessette to Richards-Bradt and recorded in Richards-

Bradt's assessment, given that the assessment was largely premised on those statements.

*See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (medical opinion

premised on subjective complaints may be disregarded where record supports ALJ in

discounting claimant's credibility); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d

595, 601 (9th Cir. 1999) (physician's opinion premised to large extent on claimant's own

accounts of her symptoms and limitations may be disregarded where subjective

complaints have been properly discounted).  Moreover, substantial evidence supports the

ALJ's assessment of Bessette's credibility, as discussed below.

### C.    Psychologist Brett Hartman, PsyD

Bessette next contends that the ALJ erred in his analysis of psychologist Dr.

Hartman's evaluation by stating that it was based solely on Bessette's self-reporting.

(Doc. 14-1 at 15.)  Dr. Hartman performed a consultative psychiatric evaluation of

Bessette on March 10, 2011, diagnosing Bessette with PTSD, dysthymic disorder, social

phobia, obsessive-compulsive personality features, and rule out borderline intellectual

functioning.  (AR 357.)  Despite these impairments, Dr. Hartman found that Bessette

appeared able to follow and understand simple directions and instructions, and able to

perform a variety of simple and rote tasks.  (*Id.*)  On the other hand, Dr. Hartman opined

that Bessette had moderate difficulty maintaining attention and concentration, moderate

problems relating adequately to others, moderate difficulty dealing appropriately with the normal stressors of life, and was unlikely to be able to perform complex tasks independently due to his significant learning impairment.  (*Id.*)

The ALJ gave little weight to Dr. Hartman's evaluation because it "was based solely upon the self-report of [Bessette] and statements by his wife," and "[t]here are no mental health treatment provider notes" to support it.  (AR 32; *see* AR 353.)  As discussed above, these are proper factors to consider in evaluating the opinion of a consulting physician.  *See Tonapetyan*, 242 F.3d at 1149; *Morgan*, 169 F.3d at 601; 20 C.F.R. § 404.1527(c)(4).  Moreover, it is true that the record contains no notes from a *treating* mental health provider, and Dr. Hartman merely consulted with Bessette on one occasion.  Furthermore, even if the ALJ erred in failing to explicitly consider Dr. Hartman's diagnosis of rule out borderline intellectual functioning, Bessette fails to state how this error would have affected the ALJ's RFC determination, which accounted for Bessette's intellectual limitations by stating that Bessette could perform only simple tasks and adapt to only simple changes.  (AR 31.)

### D.    Mental Health Counselor Thomas Mott, MS, LCMHC, LADC

Next, Bessette finds fault with the ALJ's analysis of the psychological evaluation of Mott, a mental health counselor who met with Bessette for approximately one hour on February 28, 2012.  (Doc. 14-1 at 15.)  Mott diagnosed Bessette with MDD, "Recurrent, Severe [w]ithout Psychotic Features," rule out PTSD, rule out nicotine dependence, rule out caffeine dependence, and rule out bipolar disorder, and assigned a GAF score of 45.  (AR 453.)  Bessette claims the ALJ should have noted that Mott's diagnosis of MDD

included the language "recurrent, severe without psychotic features," and should have explicitly considered that Mott assigned a GAF rating of 45 to Bessette.  (Doc. 14-1 at 15.)

The ALJ considered and described Mott's examination notes and diagnoses, but found they were not supported by the record.  (AR 33.)  Specifically, the ALJ accurately stated that Bessette reported six psychiatric hospitalizations and treatment at the Seneca Center, but there are no records to support that claim.  (*Id.*)  The ALJ also accurately stated that Mott did not render an opinion regarding any functional limitation.  (*Id.*)  The ALJ also properly noted that Mott saw Bessette only one time for only approximately one hour.  (AR 28.)  Regarding the GAF score assigned by Mott, the ALJ did in fact consider it, despite Bessette's claim to the contrary.  Specifically, the ALJ stated that he gave *all* the GAF scores in the record "very limited weight" because they are "subjective" and "only general[] estimates," and most were given after the provider had performed only one evaluation of Bessette, as was the case with Mott.  (AR 32.)

E.    **GAF Scores**

Bessette claims the ALJ erred in failing to consider the low GAF scores contained in the record, including the score of 45 assigned by Mott in February 2012, the score of 35 assigned by Dr. Vargas in March 2012, and the score of 42 assigned by Richards-Bradt in April 2012.  (Doc. 18 at 4; *see* AR 453, 559, 571.)  "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic*

*and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)).  Bessette's GAF scores of

35, 42, and 45 suggest significant impairment in functioning.  The scores of 42 and 45

place him in the 41–50 category, indicating serious symptoms (e.g., suicidal ideation,

severe obsessional rituals, frequent shoplifting), or serious impairment in social,

occupational, or school functioning (e.g., no friends, unable to keep a job); and the score

of 35 places him in the 31–40 category, indicating some impairment in reality testing or

communication (e.g., speech is at times illogical, obscure, or irrelevant), or major

impairment in several areas, such as work or school, family relations, judgment, thinking,

or mood (e.g., avoiding friends, neglecting family, unable to work).  Am. Psychiatric

Ass'n, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* 32 (4th ed.

1994).

       Despite these low GAF scores, the Court finds no error.  Preliminarily, although

the ALJ did not explicitly mention each GAF score assigned to Bessette by his various

consulting providers, he did in fact consider these scores, as stated above.  The ALJ

assigned very little weight to them on the principal grounds that they are subjective and

most were "rendered after only one evaluation."  (AR 32.)  In other words, the ALJ

declined to assign significant weight to the low GAF scores because they were assessed

for the most part by consultants who saw Bessette for a brief period on only one

occasion, and not by treating providers who saw Bessette frequently over a lengthy

period.  The only provider who assigned a GAF score to Bessette and also observed

Bessette on more than one occasion was Dr. Vargas, and even he treated Bessette for

only a five-day period while Bessette was admitted to the hospital for taking too many

Seroquel tablets.[3]  (AR 558–61.)  Although Bessette was initially assessed with a low GAF score (35) when he was admitted to the hospital, at the time of discharge, Dr. Vargas assessed him with a much higher score (71), which generally indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors" and the individual has "no more than slight impairment in social, occupational, or school functioning." *DSM-IV* at 32.  (*See* AR 559, 561.)

The Court finds no error in the ALJ's analysis of the GAF scores assigned to Bessette.  The *DSM-IV* itself states that GAF scores generally assess the level of functioning "at the time of the evaluation" only.  *DSM-IV* at 30.  Thus if the provider sees the patient only one time, the score is less valuable.  Clearly, a treating provider is better able to assess his or her patient's level of functionality than a provider who meets with the patient for one, brief visit.  Moreover, as this Court has stated before, a low GAF score–in and of itself–does not demonstrate that an impairment significantly interferes with a claimant's ability to work.  *Parker v. Comm'r of Soc. Sec. Admin.* No. 2:10-CV-195, 2011 WL 1838981, at \*6 (D. Vt. May 13, 2011) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score.")).  Rather, a low GAF score is only "one factor" to consider in determining an individual's ability to perform substantial gainful activity.  *Parker*, 2011 WL 1838981, at \*6 (citation omitted);

---

[3]  The hospital records, dictated by Dr. Vargas, indicate that, during this five-day hospital admission, Bessette first stated that he was depressed, going through a divorce, and wanted to kill himself; then later stated that he was confused about his medications and did not want to kill himself; and finally stated that he took the extra medication not as a suicidal gesture but because he liked the feeling he got from taking extra Seroquel.  (AR 558–61.)

*see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (holding that an ALJ's failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination).  Bessette presents no law requiring ALJs to specifically name each GAF score in the record, and there is no reason why the ALJ could not analyze them as a whole, as the ALJ did in this case.  Although Bessette claims the ALJ should not have explicitly mentioned Dr. Vargas's high GAF score of 71 without explicitly mentioning the three lower scores, there could be no error, as the ALJ's decision does not indicate that he gave the high score any more weight than the lower three.  (*See* AR 30, 32.)  Rather, the ALJ states that he gave "each of the[] [GAF scores]" very limited weight.  (AR 32.)

### F.    Non-Examining Psychological Agency Consultant T. Bruni

Next, Bessette contends that the ALJ placed too much weight on the psychological assessment of T. Bruni, a non-examining agency consultant.  (Doc. 14-1 at 16.)  In March 2011, after reviewing the record, Bruni completed a Psychiatric Review Technique Form (AR 374–87) and a Mental RFC Assessment (AR 388–91), opining that Bessette retained the capacity to understand and follow directions, sustain attention and concentration for simple tasks, respond and relate adequately to others in a low-contact setting, and adapt to simple changes (AR 390).  Noting that Bruni was "an accept[able] medical source" (AR 35), the ALJ adopted Bruni's mental RFC assessment in his RFC determination (AR 31).

Bessette correctly points out that the ALJ identifies Bruni as "T. Bruni, PhD" and "Dr. Bruni," despite there being no indication in the record that Bruni either has a PhD or

is a medical doctor.  (Doc. 14-1 at 16.)  Bruni did, however, include the code "38" in her

assessment (AR 374), which corresponds with the medical specialty "Psychology"

according to the Social Security Administration's Program Operations Manual System

(POMS), *see* POMS DI 26510.090, *available at*

https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510090 (last visited Feb. 18, 2015).

Bessette argues that this does not demonstrate Bruni's credentials, but merely that his

area of specialty is psychology, and thus it is unclear whether he was an "acceptable

medical source" under the regulations.  (Doc. 14-1 at 16.)  But, as the Commissioner

points out, the New York State's "Office of the Professions" website lists "BRUNI

TERRI LINDEN" as being licensed to practice psychology in that state since June 1992.

*See* NYSED.gov, Office of the Professions, Online Services, *available at*

http://www.nysed.gov/coms/op001/opsc2a?profcd=68&plicno=011335&namechk=BRU

(last visited Feb. 18, 2015).  And the POMS provides that, when it is not possible to

verify that an individual is an acceptable medical source by more traditional means, it is

proper to resolve the issue by using an official state agency website—such as New

York's "Office of the Professions" website—which is maintained for the purpose of

verifying medical licensure.  *See* POMS DI 22505.004(B)(2), *available at*

https://secure.ssa.gov/apps10/poms.nsf/lnx/0422505004 (last visited Feb. 18, 2015).

In Vermont, the regulations define "acceptable medical sources" to include "[l]icensed or

certified psychologists," 20 C.F.R. § 404.1513(a)(2), and the POMS states that even a

master's degree in psychology suffices to show that an individual is an "acceptable

medical source," POMS DI 22505.004(A)(2), *available at*

https://secure.ssa.gov/apps10/poms.nsf/lnx/0422505004 (last visited Feb. 18, 2015).

Therefore, even assuming the ALJ erred in referring to Bruni as "T. Bruni, PhD" and

"Dr. Bruni," the ALJ's reliance on his opinion was not error, given that Bruni is a

licensed psychologist and thus an acceptable medical source.

      Bessette also contends that the ALJ should not have relied on Bruni's assessment

because it was rendered in March 2011, before "a considerable amount of medical

information" was added to the record.  (Doc. 14-1 at 16.)  Specifically, Bessette notes

that Mott's February 2012 evaluation, Dr. Vargas's March 2012 hospitalization notes,

and Richards-Bradt's April 2012 evaluation, were all submitted after Bruni prepared his

assessment.  (*Id.*)  Bessette fails to indicate, however, how these subsequent records

undermined Bruni's assessment.  As discussed above, the Court finds that the ALJ's

decision to give little weight to these records was proper, namely because they did not

include functional limitations and, with the exception of Dr. Vargas's hospitalization

notes, they were prepared by medical sources who saw Bessette on only one occasion.

Moreover, regarding Dr. Vargas's notes, they indicate that when Bessette was discharged

from the hospital in March 2012, he was pleasant, cooperative, denying suicidal ideation,

and demonstrating a fine mood and full affect.  (AR 561.)  The notes also state that

Bessette's orientation, memory, and concentration were normal, and his general

knowledge, judgment, and insight were fair.  (*Id.*)  Bessette claims these records are "an

anomaly," the result of his improved condition after receiving five days of inpatient care

(Doc. 18 at 1), but fails to state what evidence in the record supports this contention.

The Court finds that the ALJ did not err in giving significant weight to the opinions of consultant Bruni.  State agency medical consultants are "highly qualified" in their area of specialty and also "experts in Social Security disability evaluation," and thus their opinions must be considered.  20 C.F.R. § 404.1527(e)(2)(i).  While treating source opinions presumptively are entitled to controlling weight, and examining source opinions ordinarily are given greater weight than non-examining consultant opinions, opinions of these non-examining consultants may be afforded greater weight than treating source opinions where there is good reason to reject the treating source opinions and substantial evidence supports the consultant opinions.  *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) ("[the regulations] permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record").  Here, there are no treating physician opinions in the record, other than those provided by Dr. Vargas in his notes from Bessette's five-day hospitalization.  Those notes support Bruni's assessment of Bessette's mental limitations, concluding that Bessette had a normal mental status examination at the time of his discharge from the hospital.  (*See* AR 561.)  Moreover, Bruni specializes in the subject under review, psychology, and his opinions are supported by the record as a whole.  Thus, the Court finds that the ALJ's decision to give more weight to Bruni's consulting opinions comports with the law and is supported by substantial evidence.

## III.   Substantial Evidence Supports the ALJ's Credibility Assessment.

Finally, Bessette argues that the ALJ's credibility assessment is not supported by substantial evidence.  The ALJ found Bessette "credible, but not to the extent alleged."

(AR 32.)  The ALJ explained that the objective evidence "falls short of demonstrating the existence of pain and limitations that are so severe that [Bessette] [could not] perform any work on a regular and continuing basis."  (*Id.*)

It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  When evaluating the credibility of a claimant's statements, the ALJ "must consider the entire case record and give specific reasons for the weight given [thereto]."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  If the ALJ's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints, even if substantial evidence supporting the claimant's position also exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").

Bessette contends the ALJ "did not state any testimony or statement that he found to be not credible and did not provide any specific support for his adverse credibility finding," instead relying on "statements of the regulations and rulings and platitudes" to support his credibility assessment.  (Doc. 14-1 at 18.)  The record does not support this contention.  Rather, the ALJ's decision contains several specific reasons in support of his negative assessment of Bessette's credibility.  First, the ALJ stated that the objective medical evidence was inconsistent with Bessette's allegations that he suffered from "an extremely limited range of functional abilities."  (AR 32.)  As the ALJ discussed throughout his decision, despite Bessette's complaints of severe back pain, objective

24

testing and examination regarding Bessette's back problems demonstrated only mild findings (AR 28, 32, 368–73), and no treating provider opined that Bessette's back problems resulted in significant functional limitations (AR 29).  Regarding Bessette's assertions of significant mental limitations, the ALJ considered that two mental health providers who examined Bessette, Mott and Richards-Bradt, did not opine that he had any functional mental limitations, *see Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say."); and that Dr. Vargas released Bessette from the hospital based on normal findings in a mental status examination.  (AR 33, 34, 451–55, 559, 563–71.)

Second, the ALJ specifically stated in his decision that Bessette reported being off all medication for three months in 2011, telling a provider that "'going to counseling is a joke'" and he was only there "to [have] paperwork filled out for state benefits."  (AR 32 (quoting AR 448).)  The ALJ also noted (AR 33) that Bessette told the provider that he was "[u]nwilling to consider going back on meds at th[at] time" (AR 448).  (*See also* AR 33 (ALJ stating that Bessette "reported taking no medication for three months and was out of medication in October 2011, and unwilling to re-start taking medication").)  The ALJ further stated that, despite being referred to group psychiatric therapy and follow-up individual therapy in March 2012, there is no indication in the record that Bessette followed up on these recommendations.  (*Id.*)  It was proper for the ALJ to consider Bessette's lack of compliance with taking medication and attending counseling as a factor in assessing his credibility.  The regulations state:  "If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . ."  20 C.F.R. §

25

404.1530(b).  And the Social Security Administration has determined that a claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  SSR 96-7p, 1996 WL 374186, at *7; *see* 20 C.F.R. § 404.1529(c)(3)(iv), (v); 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . ."); *Calabrese v. Astrue*, 358 F. App'x 274, 277–78 (2d Cir. 2009) (failure to take medication as prescribed an appropriate factor to consider in assessing claimant's credibility); *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (proper for ALJ to use evidence of claimant's noncompliance to weigh credibility of claimant's subjective claims of pain).  Bessette argues that his occasional failure to take prescribed medication "seem[s] to be a sign of the severity of his depression rather than an indication . . . that [his] symptoms were not severe."  (Doc. 18 at 7.)  But no treating or consulting mental health provider rendered that opinion, and Bessette has not presented evidence—other than his self-serving statements—to support it.

Third, the ALJ properly pointed out several inconsistencies between statements Bessette made to medical providers, and the medical record itself.  *See* SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").  For example, the ALJ made the following observations: (1) Bessette reported that his wife threw out his medication in February 2012, but medical records indicated that Bessette was unwilling to take his medication during that period; (2) Bessette reported that he had

spoken with a crisis clinic multiple times, but the clinic had no records documenting any conversations with him; (3) Bessette reported that he had six psychiatric hospitalizations and treatment at the Seneca Center, but there are no records demonstrating such intense treatment; (4) Bessette reported being admitted to FAHC four to five times, including on March 7, 2012, but FAHC records from that date indicate that he was not admitted but rather merely seen and discharged with instructions regarding medication use; and (5) Bessette reported attempting suicide by taking 1700 mg of Seroquel in April 2011, but there is no record of an April 2011 hospitalization.  (AR 33–34; *see* AR 451, 563.)

There is substantial evidence in the record to support the ALJ's specific reasons in support of his assessment of Bessette's credibility.  Although the ALJ was "required to take [Bessette's] reports of pain and other limitations into account," he was "not required to accept [Bessette's] subjective complaints without question."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).  Rather, the ALJ had discretion to weigh the credibility of Bessette's testimony "in light of the other evidence in the record."  *Id.* While another factfinder could view the evidence in a light more favorable to Bessette, the court may not substitute its own credibility determination for that of the ALJ's unless the latter was "patently unreasonable."  *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted).

## Conclusion

In sum, the Court finds that the ALJ did not err at step two, and properly considered and analyzed the medical assessments and GAF scores.  Of particular importance, most of the medical assessments are not from acceptable sources, and all but

one of the sources who provided assessments met with Bessette on only one occasion. Although Dr. Vargas had a treating relationship with Bessette, even that relationship was limited to a five-day period while Bessette was admitted to the hospital.  The Court also finds that the ALJ's credibility assessment is supported by substantial evidence.

For these reasons, the Court DENIES Bessette's motion (Doc. 14), GRANTS the Commissioner's motion (Doc. 17), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 27th day of February, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge